UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

D. B. WALLACE o/b/o )
PHYLLIS REEVES (Deceased) )
)
V. ) NO. 2:09-CV-8
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

Plaintiff has filed this judicial appeal of the Commissioner's denial of Phyllis Reeves' application for disability insurance benefits under the Social Security Act.[1] Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 8 and 12].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

---

[1] Ms. Reeves had also filed an application for supplemental security income, the appeal of which was dismissed upon her death.

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Ms. Reeves' insured status expired on September 30, 2006, and disability must be established as of that date. Her alleged disability onset date was January 20, 2006. Plaintiff asserted that she had diabetes with associated diabetic neuropathy and peripheral vascular disease, hypertension, chronic obstructive pulmonary disease, and depression accompanied by anxiety, stress and sleep disturbances.

The plaintiff has set forth the medical record of Ms. Reeves in his memorandum as follows:[2]

> Plaintiff received treatment at Hawkins County Memorial Hospital on September 20, 2005. Plaintiff had fallen asleep wearing a heating pad on her feel the previous week, due to her feet feeling very cold, and woke up the next morning and noticed a very red and blistered big toe on the left foot. Due to Plaintiff's peripheral neuropathy, she did not have any pain and thought that she would just continue to watch it and it would get better; however, the blister continued to get larger, the toes became redder, and she started getting a dark area at the base of the toes. The assessment was questionable degree of burn on the left second and great toes, actively draining vesicle, erthyema, edema, and cellulitis. Plaintiff was admitted and started on Primaxin IV and IV rehydration and was also given insulin in the Emergency Room for elevated glucose of 400. It was noted Plaintiff may need some debridement of the toe to assess the severity of the burn on the tips of the toes; however, the record doesn't contain the discharge summary or further information regarding the admission (Tr. 164-166).
>
> Plaintiff was again admitted to Hawkins County Memorial Hospital from September 29, 2005 through October 7, 2005, due to the admitting diagnoses of diabetic and burn to the left great and second toe. It had become obvious Plaintiff was developing full thickness necrosis of the distal portion of the toe with cellulitis extending onto the forefoot and it was felt that admission with antibiotic therapy was urgent in order to preserve the leg in view of severe vascular disease. The cellulitis demarcated fairly rapidly and it became apparent that amputation of the toe itself would be sufficient. Plaintiff underwent amputation of the first left toe; however, the foot began to demonstrate marked increase in pain with cellulitis advancing towards the forefoot. Dr.

---

[2] The plaintiff refers to Ms. Reeves, deceased, as the plaintiff. Any references hereinafter to the "plaintiff" will refer to Ms. Reeves.

2

Wilson became very concerned about the progression of ischemia of the foot itself in view of the fact that Doppler study suggested a proximal occlusion such as aortofemoral and it was felt Plaintiff was a candidate for fairly urgent assessment of her proximal vasculature; thus, she was transferred to Holston Valley hospital for arteriographic study and either possible angioplasty or vasculature reconstruction to save the foot (Tr. 167-168).

Plaintiff received treatment at Medical Associates of Rogersville, by Dr. Stephen K. Wilson, from April 23, 2004 through January 5, 2006. Conditions and complaints addressed during this time include abdominal pain, significant right upper quadrant pain, chronic cholelithiasis, peripheral neuropathy, poorly controlled diabetes, diabetic burn to the left great and $2_{nd}$ toe resulting in amputation, significant diabetic neuropathy in the legs with burning pain in both legs and feet and left foot drop, hypertension, tachycardia, heart murmur, tobacco abuse, bladder spasms, and severe diabetic peripheral vascular disease (Tr. 169-204). On April 23, 2004, abdominal ultrasound showed small echogenic focus related to the gallbladder, most suggestive of a cholesterol polyp (Tr. 200). On April 28, 2004, CT scan of the abdomen showed atherosclerotic change dorsally with calcification extending into the iliac branches. The impression was atherosclerosis (Tr. 203). On June 14, 2004, operative cholangiogram yielded the impression of distal narrowing possibly related to postoperative spasms, with clinical correlation necessary (Tr. 198).

Dr. A. H. Mohamed was Plaintiff's treating neurologist from November 11, 2004 through June 30, 2005, for follow-up up of diabetic peripheral neuropathy and left peroneal neuropathy (Tr. 205-214). Plaintiff first presented with complaints of numbness, weakness, and pain from the knee down that started in the left and is now involving the right leg as well. Plaintiff also reported that she sometimes has to drag the left foot. Exam was remarkable for muscle bulk in the left lower leg smaller than the right; weak muscle power in the left foot, dorsiflexion and eversion; 2/4 reflexes in the knees and 0/4 in the ankles; decreased pinprick sensation in the left leg and foot; and left foot drop. EMG/nerve conduction study revealed severe axon loss, sensory-motor polyneuropathy consistent with diabetic polyneuropathy, and left peroneal mononeuropathy across the knee likely due to diabetes as well (Tr. 210-214). By March 16, 2005, Plaintiff was falling frequently due to her legs giving way; she was having low back pain; her left foot was weak; and she was having stiffness and pain in the hip areas. On exam, Plaintiff looked older than her years; there was weakness in left foot dorsiflexion and eversion; the ankle reflexes were absent; pinprick sensation was decreased in the left leg; and her gait was affected by her left foot weakness. The diagnoses were diabetic polyneuropathy; left peroneal neuropathy across the knee, likely diabetic; and low back pain, perhaps related to degenerative disease of the spine (Tr. 208-209). On June 30, 2005, review of systems was positive for leg pain on walking, difficulty walking, pain in the feet, and edema of the legs. Exam was remarkable for absent ankle reflexes, profound edema in the lower extremities, and decreased pinprick sensation in the left leg. The diagnoses remained the same (Tr. 206-207).

Plaintiff received treatment at Hawkins County Health Department from January

17, 2006 through March 9, 2006, during which time she was suffering chest pain, uncontrolled diabetes mellitus type II, hypertension, peripheral vascular disease, heart murmur, bilateral leg pain, gastroesophageal reflux disease [hereinafter "GERD"], left toe cellulitis, nicotine addiction, swelling in the lower extremities, anxiety, and depression (Tr. 215-229).

Plaintiff underwent consultative exam by Dr. Wayne Page on July 18, 2006. Dr. Page does not note review of any medical records, but noted Plaintiff's complaints of heart murmur, hypertension, bad circulation, vascular complications resulting in toe amputation, numbness in the feet, diabetic neuropathy, and diabetes. Review of systems was positive for slight hearing loss, acid reflux, arthritis in the hips and ankles, tension headaches, and chest pain. The diagnoses were insulin-dependent diabetes with reported diabetic neuropathy and peripheral vascular disease and hypertension. Dr. Page opined Plaintiff has no impairment-related physical limitations, but requires routine precautions against hypoglycemia for an insulin-dependent diabetic (Tr. 230-235).

On August 1, 2006, a non-examining state agency physician opined Plaintiff can lift and/or carry a maximum of 50 pounds occasionally, 25 pounds frequently; can stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; can sit (with normal breaks) for a total of about six hours in an eight-hour workday; and must avoid concentrated exposure to extreme cold and hazards (machinery, heights, etc.). Dr. Robinson only notes review of the exam of Dr. Page and office notes from the Health Department (Tr. 236-243).

On October 24, 2006, a non-examining state agency physician opined that, from January 20, 2006 through the date of the assessment, Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting (Tr. 247-264).

On October 27, 2006, a non-examining state agency physician opined Plaintiff can lift and/or carry a maximum of 50 pounds occasionally, 25 pounds occasionally; can stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; can sit (with normal breaks) for a total of about six hours in an eight-hour workday. Dr. Bell notes basing this assessment on the diagnoses of diabetes mellitus and status post amputation left great toe, with unidentified records dated May 2006, July 2006, and August 2006 having been reviewed (Tr. 265-272).

Plaintiff continued treatment at Hawkins County Health Department from March 15, 2006 through September 11, 2007. Conditions and complaints addressed during this time include GERD, uncontrolled diabetes mellitus, hypertension, peripheral vascular disease, worsening depression, congestive heart failure, chronic renal insufficiency, diabetic neuropathy, peripheral vascular disease, chest pain, bilateral lower extremity edema, heart murmur, dermatitis, hyperlipidemia, difficulty walking secondary to pain in legs, stress, sleep disturbance, headache, left arm numbness and tingling, cold feet,

4

decreased sensation in the feet, and weak pulses (Tr. 273-300, 346).

  Plaintiff was admitted to Hawkins County Memorial Hospital from February 21, 2007 through February 24, 2007, due to the discharge diagnoses of COPD exacerbation; hypertension, uncontrolled at the time of discharge; uncontrolled diabetes mellitus type II, controlled at the time of discharge; peripheral vascular disease; diabetes mellitus with peripheral neuropathy; and congestive heart failure (Tr. 349-364).

  Plaintiff received Emergency Room treatment at Hawkins County Memorial Hospital on four occasions from November 16, 2006 through September 11, 2007. Treatment was rendered for abscess on back, elevated blood pressure associated with headache and arm numbness, unstable angina, acute coronary syndrome, uncontrolled diabetes mellitus type II, chronic renal failure, uncontrolled hypertension, depression, COPD exacerbation, and dyslipidemia (Tr. 365-398, 347-348).

  Plaintiff has received treatment at Holston Valley Medical Center. Admission was required from May 17, 2007 through May 21, 2007, due to the admitting diagnoses of acute coronary syndrome, unstable angina versus small non-ST elevation myocardial infarction; coronary artery disease, questionable severity; atypical chest pain; mitral regurgitation; complicated neuropathy/nephropathy, uncontrolled diabetes mellitus; accelerated hypertension, rule out renal artery stenosis; dyslipidemia; tobacco abuse; GERD; chronic obstructive pulmonary disease [hereinafter "COPD"]; and acute on chronic renal failure. The final diagnoses upon discharge were non-cardiac chest pain, hypertension, peripheral vascular disease, COPD, uncontrolled diabetes mellitus type II, and renal failure (Tr. 301-316). On July 14, 2007, chest x-rays showed probable bilateral pleural effusions (Tr. 340-343).

[Doc. 9 pgs. 2-6].

  The ALJ held an administrative hearing on September 18, 2007. After taking the plaintiff's testimony, he called Cathy Sanders, a Vocational Expert ["VE"]. He asked Ms. Sanders to assume a 49 year old individual, with past relevant work experience as a certified nursing assistant, which was semi-skilled and heavy. He further asked her to assume the individual had a high school education and a certified nursing assistant certificate. He asked her to assume the individual was limited to light work, which required lifting 20 pounds occasionally and 10 pounds frequently, and must be allowed frequent postural changes. He also asked her to assume the person could not work in an environment that would expose her to excessive dust, fumes, chemicals, and temperature extremes. When asked then if there

5

was work such an individual could perform, Ms. Sanders identified office clerk, cashier and ticket clerk positions. She stated that there were 6,400 such jobs in the regional economy and 574,000 in the nation. (Tr. 52 and 53).

In his hearing decision, the ALJ found that the plaintiff had severe impairments of diabetes with associated diabetic neuropathy and peripheral vascular disease, hypertension and chronic obstructive pulmonary disease. He found that she did not have a severe mental impairment. He found that none of her impairments met or equaled any listed impairments. He found she could do a limited range of light work. Based on the testimony of Cathy Sanders, the VE, he found that there were a significant number of jobs which Ms. Reeves could perform. Accordingly, he found that she was not disabled.

Plaintiff raises two assertions of error. First, he asserts that the ALJ erred in not finding that Ms. Reeves had a severe mental impairment. Second, he asserts that the ALJ erred in not finding that she met or equaled the requirements of Listing 9.08, and did not adequately discuss his reasons for not doing so.

With respect to Listing 9.08, that listing requires that to meet it, a person must suffer from diabetes mellitus with "[n]europathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." 11.00C states:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which by be due to cerebral, cerbellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms

6

It is unquestioned that the plaintiff suffered from diabetes millitus. It is also unquestioned that she suffered neuropathy. However, the neuropathy must be demonstrated by significant and persistent disorganization of motor function. Here, Dr. Page, who examined the plaintiff, found that she had "normal gait, posture, appearance and station." She did not need help getting on or off of the exam table or in rising from a chair. She had a "normal ability to grasp and manipulate objects..." Her extremities were "[n]ormal with the exception of left great toe amputated near the MP joint." (Tr. 234). As previously stated, he found no impairment-related limitations. (Tr. 235). Her own physicians did not place any limitations upon her ability to move about or her ability to manipulate objects. Dr. Page constitutes substantial evidence for the ALJ's finding that she met no listing. For that reason, the plaintiff's argument that the ALJ did not adequately discuss his finding that she met no listed impairment is, at best, a harmless error under the facts of this case.

With respect to the plaintiff's mental impairment, the Commissioner has a more serious problem. The medical records prior to the expiration of her insured status on September 30, 2006, indicate ongoing treatment with Prozac for her depression, anxiety and sleep disturbances, largely unsuccessful. (Tr. 220, 223, and 225). Plaintiff stated on March 23, 2006 that she was having no improvement in her depression in spite of the Prozac. (Tr. 295). On August 16, 2006, her Prozac was increased. (Tr. 287). On March 1, 2007, she reported that her depression was getting worse, even with the higher dosage of Prozac. She was referred to Hawkins County Mental Health. (Tr. 286).

On October 24, 2006, State Agency Psychologist Rebecca P. Joslin opined that the plaintiff had moderate difficulties in maintaining concentration, persistence and pace. (Tr.

7

257). Dr. Joslin also opined that plaintiff was moderately limited in her ability to complete a normal workday and workweek, to interact appropriately with the general public, and to respond to changes in the work setting. (Tr. 262).

The ALJ, with all of this information available, declined to send her for a psychological evaluation. It is true, as the Commissioner asserts, that he is only required to have a consultative examination performed if the evidence "is not sufficient to support a decision on a claim." [Doc. 13, pg. 8]. However, that statement begs the question. Determining whether the evidence is so sufficient is precisely where we are at this point, and where the ALJ was when he evaluated Ms. Reeves' application.

Ms. Reeves is now deceased, and cannot be further evaluated. In light of the only assessment indicating moderate difficulties which the ALJ rejected and which were not presented to the VE, the Court cannot say that the ALJ did not substitute his medical opinion for that of the doctors who prescribed Prozac and for the State Agency psychologist who found those moderate difficulties. There is simply nothing to fill the void and provide substantial evidence for the ALJ's actions.

By the same token, the Court does not feel that the plaintiff has demonstrated that an award of benefits is mandated at this point. It is possible that the VE could still determine that there were jobs available which Ms. Reeves could have performed with the moderate limitations opined by the State Agency psychologist. Accordingly, the case should be remanded to add this question to the physical limitations addressed to the VE by the ALJ. To this end, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 8] be GRANTED, and the case remanded for this purpose. It is also

8

respectfully recommended that the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be DENIED.[3]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

9

Case 2:09-cv-00008-JRG-DHI   Document 14   Filed 02/11/10   Page 9 of 9   PageID #: 72